UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRYAN CASLER-TYRRELL; JULIE CASLER-
TYRRELL; and DAVID CASLER-TYRRELL,

                              Plaintiffs,

v.                                                          5:18-CV-0892
                                                            (GTS/ML)
AUBURN COMMUNITY HOSPITAL; ALTHEA
SUSLIK, FNP; PAUL KOENIG, M.D.; and
EASTERN FINGER LAKES EMERGENCY
MEDICAL CARE, PLLC,

                              Defendants.
_____

APPEARANCES:                                     OF COUNSEL:

POWERS & SANTOLA, LLP                            DANIEL R. SANTOLA, ESQ.
   Counsel for Plaintiffs                        LAURA M. JORDAN, ESQ.
100 Great Oaks Blvd., Suite 123                  KELLY WOLFORD, ESQ
Albany, NY 12203

THORN, GERSHON, TYMANN & BONANNI                 ALICIA M. DODGE, ESQ.
   Counsel for Defendant Auburn C.H.             PAUL D. JURELLER, ESQ.
5 Wembley Court
P.O. Box 15054
Albany, NY 12205

SMITH, SOVIK, KENDRICK & SUGNET, P.C.            MICHAEL P. RINGWOOD, ESQ.
   Counsel for Defendant Suslik
250 South Clinton Street, Suite 600
Syracuse, NY 13202-1252

SUGARMAN LAW FIRM, LLP                           JEFFREY M. NARUS, ESQ.
   Counsel for Defendant Koenig                  ZACHARY M. MATTISON, ESQ.
211 West Jefferson Street
Syracuse, NY 13202

AMDURSKY, PELKY, FENNELL & WALLEN, P.C.          TIMOTHY J. FENNELL, ESQ.
   Counsel for Defendant EFLEMC
26 East Oneida Street
Oswego, NY 13126

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this medical malpractice action filed by Bryan Casler-Tyrrell, Julie Casler-Tyrrell, and David Casler-Tyrrell ("Plaintiffs") against Auburn Community Hospital ("Auburn C.H."), Althea Suslik, FNP, Paul Koenig, M.D., and Eastern Finger Lakes Emergency Medical Care, PLLC ("EFLEMC") ("Defendants"), are the following motions: (1) Defendant Auburn C.H.'s motion for partial summary judgment; (2) Defendant Koenig's motion for summary judgment; (3) Plaintiffs' cross-motion for summary judgment against Defendant Auburn C.H.; and (4) Plaintiffs' cross-motion to allow Plaintiffs' expert Dr. Tibbles provide certain opinions related to Defendant Koenig's liability.  (Dkt. Nos. 57, 58, 59, 60.)  For the reasons set forth below, Defendant Auburn C.H's motion is granted, Defendant Koenig's motion is granted, Plaintiff's cross-motion for summary judgment against Defendant Auburn C.H. is denied, and Plaintiff's cross-motion related to Dr. Tibbles' testimony is denied.

## I.     RELEVANT BACKGROUND

### A.     Plaintiffs' Amended Complaint

Generally, in their Amended Complaint, Plaintiffs assert the following three claims against all Defendants: (1) a claim of medical malpractice in that Defendants were negligent and departed from good and accepted medical practices when treating Plaintiff Bryan Casler-Tyrrell; (2) a claim of failure to obtain informed consent for treatment in that Defendants failed to advise Plaintiffs of the risks or possibilities of permanent injury that could result from the medical treatment that was rendered, to the extent that a reasonably prudent person would not have consented to the provided treatment (or lack thereof) had he been fully informed; and (3) a claim for loss of services and recovery of medical expenses incurred related to Plaintiff Bryan Casler-

Tyrrell's treatment, brought by his parents Plaintiffs Julie and David Casler-Tyrrell.  (Dkt. No. 19 [Pls.' Am. Compl.].)

      **B.**      **Undisputed Material Facts on Defendant Auburn C.H.'s Motion for Summary Judgment**

      Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendant Auburn C.H. in its Statement of Material Facts and either admitted by Plaintiffs or denied without appropriate evidentiary support in their response thereto. (*Compare* Dkt. No. 57, Attach. 17 [Def. Auburn C.H.'s Rule 56.1 Statement] *with* Dkt. No. 59, Attach. 19 [Pls.' Rule 56.1 Resp.].)

      1.      On February 18, 2017, Plaintiff Bryan Casler-Tyrrell presented to Skaneateles Urgent Care with complaints of lower back and hip pain that had been present for two days.

      2.      Plaintiff Bryan Casler-Tyrrell was seen for an assessment by mid-level provider Defendant Suslik (a Family Nurse Practitioner), who issued orders for a urine dipstick, abdominal x-ray, and urine culture.

      3.      The results from the urine dipstick and abdominal x-ray were available prior to Plaintiff Bryan Casler-Tyrrell's discharge from the Urgent Care, but the urine culture was sent out for interpretation and the results for that culture were not available at the time of discharge.

      4.      Plaintiff Bryan Casler-Tyrrell was discharged home that day with a diagnosis of acute cystitis and back pain.

      5.      Plaintiff Bryan Casler-Tyrrell was instructed to take the antibiotic Bactrim twice daily for ten days.

      6.      Plaintiff Bryan Casler-Tyrrell was also instructed to follow up with his primary care provider in seven-to-ten days for repeat urine testing.

      7.      On February 22, 2017, Plaintiff Julie Casler-Tyrrell called Skaneateles Urgent

Care to obtain the results of her son's urine culture.

8.   During that phone call, Nurse Practitioner Tina Finlayson told Plaintiff Julie Casler-Tyrrell that the urine culture results were negative and that Plaintiff Bryan Casler-Tyrrell should discontinue the prescribed Bactrim.

9.   Also on February 22, 2017, supervising physician Defendant Koenig signed off on the documentation regarding Plaintiff Bryan Casler-Tyrrell's treatment at Skaneateles Urgent Care.

10.   On the morning of February 25, 2017, Plaintiff Bryan Casler-Tyrrell began experiencing mental status changes while a passenger in a vehicle on the New York State Thruway.

11.   Plaintiff Bryan Casler-Tyrrell was taken by ambulance to Clifton Springs Hospital, where he was diagnosed with bacterial meningitis.

12.   Plaintiff Bryan Casler-Tyrrell was then transferred from Clifton Springs Hospital to Upstate Medical Center in Syracuse, New York, for treatment of his meningitis; he remained hospitalized at Upstate Medical Center until April 12, 2017.

13.   Plaintiffs allege that all Defendants failed to timely diagnose and treat Plaintiff Bryan Casler-Tyrrell during his visit on February 18, 2017, for an underlying infection that ultimately escalated into meningitis, and that all Defendants failed to properly monitor or provide ongoing appropriate treatment for Plaintiff Bryan Casler-Tyrrell following his discharge from Skaneateles Urgent Care.

14.   Plaintiffs also allege that Defendant Auburn C.H. is vicariously liable for the actions of Defendants EFLEMC, Suslik, and Koenig.

15.   Defendant Auburn C.H. entered into a written Urgent Care Centers Service

Agreement with Defendant EFLEMC in May 2013, in which Defendant Auburn C.H. retained

Defendant EFLEMC to provide all medical services, including staffing of mid-level providers

and attending physicians at two Urgent Care Centers, including Skaneateles Urgent Care.

16.    This Urgent Care Centers Service Agreement was amended effective June 1,

2016, through July 29, 2017.

17.    Defendants Suslik and Koenig are not employees of Defendant Auburn C.H.

18.    Non-party individuals Patsy Iannolo, M.D., and Nurse Practitioner Finlayson are

also not employees of Defendant Auburn C.H.

19.    Plaintiffs disclosed four medical experts concerning Defendants' liability: (a)

Nurse Practitioner Diane Meehan, Ph.D., F.N.P.; (b) emergency medicine physician Carrie

Tibbles, M.D.; (c) neurosurgeon Jason Sheehan, M.D.; and (d) infectious disease physician Alan

Sanders, M.D.

20.    These expert reports do not contain any independent criticisms against Defendant

Auburn C.H. specifically, or provide any expert opinion as to alleged deviations from the

standard of care that proximately caused Plaintiffs' alleged injuries by Defendant Auburn C.H.

specifically.[1]

---

[1]    Plaintiffs deny this asserted fact as to the expert reports from Dr. Tibbles and Dr.
Sanders, asserting that the expert reports and/or depositions of these physicians criticize the care
and treatment that Plaintiff Bryan Casler-Tyrrell received at "Auburn Community Hospital's
Skaneateles Urgent Care Center."  (Dkt. No. 59, Attach. 19, at ¶¶ 22-23, 26-27 [Pls.' Rule 56.1
Resp.].)  However, although these expert sources do opine regarding the standard of care
provided by Defendant Suslik and/or Defendant Koenig and others at Skaneateles Urgent Care,
neither of these sources opines that Defendant Auburn C.H. specifically was directly involved in
the actions at that Urgent Care.  As discussed previously, it is undisputed that Defendants Suslik
and Koenig were not employees of Defendant Auburn C.H. (in the sense that they were instead
employees of Defendant EFLEMC, an independent entity with which Defendant Auburn C.H.
had contracted to provide services at Skaneateles Urgent Care).  Thus, the fact that these sources
opined about the propriety of the care rendered at Skaneateles Urgent Care does not, in and of
itself, constitute an opinion about whether Defendant Auburn C.H. was directly involved in the
actions opined to be deviations from the standard of care and/or the proximate cause of Plaintiff
Bryan Casler-Tyrrell's injuries.  Whether Defendant Auburn C.H. is vicariously liable for the

### C.      Undisputed Material Facts on Plaintiffs' Cross-Motion for Summary Judgment Against Defendant Auburn C.H.

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Plaintiffs in their Statement of Material Facts and either admitted by Defendant Auburn C.H. or denied without appropriate evidentiary support in its response thereto. (*Compare* Dkt. No. 59, Attach. 20 [Pls.' Rule 56.1 Statement] *with* Dkt. No. 61, Attach. 2 [Def. Auburn C.H.'s Rule 56.1 Resp.].)

1.      Defendant Auburn C.H. operated the Skaneateles Urgent Care and entered into a contract with Defendant EFLEMC, under which Defendant EFLEMC was to provide medical services to the patients who presented at that Urgent Care.[2]

2.      Defendant Auburn C.H. required that Defendant EFLEMC provide physician oversight of the mid-level providers who treated patients at Skaneateles Urgent Care.

3.      The contract required that Defendant EFLEMC provide physician review of "all patient charts in accordance with regulatory requirements and in a manner sufficient to permit [Defendant Auburn C.H.] to bill, code, and collect payments for such services from patients and third-party payors."[3]

---

other Defendants' actions is beyond the scope of the asserted fact.

[2]      Defendant Auburn C.H. denies that it "operated" the Skaneateles Urgent Care. (Dkt. No. 61, Attach. 2, at ¶ 1 [Def. C.H.'s Rule 56.1 Resp.].) However, the contract cited by Plaintiffs specifically states that "WHEREAS, Hospital owns and operates a general hospital in Auburn, New York, and *operates* two Urgent Care Centers located at 303 Grant Avenue, Auburn, New York 13021, and 803 Genesee Street (Route 20), Skaneateles, New York 13152 . . . ." (Dkt. No. 59, Attach. 1, at 1 [emphasis added].) As a result, the evidence cited by Plaintiffs supports the asserted fact and Defendant Auburn C.H. has not provided any evidence to create a genuine dispute of material fact as to the use of the word "operates." This asserted fact is therefore deemed admitted.

[3]      The Court has altered the asserted fact to more accurately reflect the specific requirement in the cited contract provision. (Dkt. No. 59, Attach. 1, at 3.) This asserted fact is deemed admitted in its amended form.

6

4.      Defendant Auburn C.H. paid Defendant EFLEMC a flat rate per each patient visit

to the Skaneateles Urgent Care for the attending physician signing off on the patient's chart.[4]

5.      Defendant Auburn C.H. was responsible for billing the patients and/or the

patients' responsible insurer or governmental entitlement program for the services provided by

Defendant EFLEMC at the Skaneateles Urgent Care.

6.      The contract provided that Defendant EFLEMC was to be compensated by

Defendant Auburn C.H. at a given hourly rate for the medical services performed at Skaneateles

Urgent Care by mid-level providers.

7.      Under the contract, Defendant EFLEMC agreed that it would fully adopt and

utilize Defendant Auburn C.H.'s approved information systems, including those pertaining to

electronic health records, in accordance with Defendant Auburn C.H.'s policies and procedures.

8.      The patients' medical records of treatment at Skaneateles Urgent Care remain the

property of Defendant Auburn C.H.

9.      All of the individual documents related to Plaintiff Bryan Casler-Tyrrell's visit to

Skaneateles Urgent Care on February 18, 2017, have printed on them either the words "Auburn

Community Hospital" or the initials "ACH."[5]

10.     Plaintiff Bryan Casler-Tyrrell's medical records from his visit to Skaneateles

---

[4]      The Court has altered the asserted fact to more accurately reflect the cited deposition testimony.  (Dkt. No. 59, Attach. 8, at 69 [Iannolo Dep.].)  This asserted fact is deemed admitted in its amended form.

[5]      The parties disagree regarding which specific pages include (or do not include) what notations about Auburn Community Hospital.  However, the Court's review of the cited medical records reveals that, although a notation of the Hospital is not present on every single page of those records, it is present on every individual document (i.e., there are two pages on which neither notation is present, but those pages are part of a multiple-page document where other pages within that document contain a notation.  The Court has therefore altered the asserted fact to purport with the evidence.

Urgent Care on February 18, 2017, do not include any reference to, or identification of, Defendant EFLEMC as the provider of the care.

11.     The pamphlets entitled "Back Pain, Adult," "Urinary Tract Infection," and "Discharge Instruction Summary" that were provided to Plaintiff Bryan Casler-Tyrrell and his mother upon discharge from Skaneateles Urgent Care on February 18, 2017, all contain the notation "Auburn Community Hospital" on their respective first pages.

12.     There is no indication in the pamphlet entitled "Discharge Instructions Summary" that any services on that date were provided by or through Defendant EFLEMC.

13.     Plaintiffs were not given any written or verbal information to indicate that the services provided at Skaneateles Urgent Care were being provided by or through Defendant EFLEMC.[6]

14.     Plaintiff Julie Casler-Tyrrell did not see any identification tags on the individuals at Skaneateles Urgent Care on February 18, 2017, that contradicted her assumption that the individuals treating her son were employees of, or under control of, Defendant Auburn C.H.[7]

15.     At no time up to and including February 22, 2017, did Plaintiff Julie Casler-

---

[6]     Defendant Auburn C.H. denies an unspecified portion of this fact, arguing that it is a legal conclusion and not an assertion of fact.  (Dkt. No. 61, Attach. 2, at ¶ 17 [Def. Auburn C.H.'s Rule 56.1 Resp.].)  However, the asserted fact is supported by the cited evidence (as Defendant Auburn C.H. itself acknowledges).  (*Id.*)  The Court finds that the asserted fact is indeed a fact and not merely a legal conclusion, because it indicates what Plaintiffs believed about the treatment and the information they had (or did not have) in coming to that belief.  The asserted fact is therefore deemed admitted.

[7]     Defendant Auburn C.H. denies this asserted fact, stating only that the cited evidence does not state the exact asserted fact, but providing no contrary evidence.  (Dkt. No. 61, Attach. 2, at ¶ 18 [Def. Auburn C.H.'s Rule 56.1 Resp.].)  Because the asserted fact is supported by the record evidence, this fact is deemed admitted.

Tyrrell think or believe that the medical or other providers at Skaneateles Urgent Care were not employed by the hospital.[8]

### D.    Undisputed Material Facts on Defendant Koenig's Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendant Koenig in his Statement of Material Facts and either admitted by Plaintiffs or denied without appropriate evidentiary support in their response thereto.  (*Compare* Dkt. No. 58, Attach. 21 [Def. Koenig's Rule 56.1 Statement] *with* Dkt. No. 60, Attach. 20 [Pls.' Rule 56.1 Resp.].)[9]

### Treatment Timeline

1.    Plaintiff Bryan Casler-Tyrrell presented to Skaneateles Urgent Care on February 18, 2017, at approximately 8:45am.

2.    Plaintiff Bryan Casler-Tyrrell's complaints on presentation were low back pain and bilateral hip pain.

3.    After being triaged by a registered nurse, Plaintiff Bryan Casler-Tyrrell was seen and evaluated by Defendant Suslik.

4.    Plaintiff Bryan Casler-Tyrrell advised Defendant Suslik that his pain had been

---

[8]    The Court has modified the remaining two asserted facts because, as argued by Defendant Auburn C.H., the cited evidence does not support the asserted fact.  Specifically, the cited evidence supports that Plaintiff Julie Casler-Tyrrell had no reason to believe that the care was being provided by anyone other than Defendant Auburn C.H., but it does not support that the entire community of the county itself harbored a similar belief.  As a result, the modified asserted fact is deemed admitted given that Defendant Auburn C.H. has presented no evidence to contradict the cited evidence.

[9]    The Court notes that Plaintiffs submitted a separate Statement of Material Facts "in opposition to Defendant Koenig's motion for judgment and [in support of] Plaintiffs' motion permitting Plaintiffs the use of Dr. Tibbles' deposition testimony."  (Dkt. No. 60, Attach. 21.)  However, that separate Statement of Material Facts is not part of their response to Defendant Koenig's Statement of Material Facts (which is found at Dkt. No. 60, Attach. 20).  Furthermore, Plaintiffs' cross-motion is not one for summary judgment (and therefore does not require a Statement of Material Facts).  Rather, Plaintiff's separate Statement of Material Facts appears to merely assert additional material facts that Plaintiffs wish to bring to the attention of the Court.  The Court has therefore omitted a recitation of these asserted facts in this Decision and Order, but will still consider them as part of its analysis (to the extent that they are based on admissible evidence) when determining whether there exists a genuine dispute of material fact.

present for two days and was an 8/10 in intensity.

5.      He reported shoveling snow earlier in the week before the onset of symptoms.

6.      The pain had been worse the previous night, but was somewhat relieved by a heating pad and over-the-counter pain medication.

7.      He denied any known fever, chills, headache, neck pain, or fatigue.

8.      Plaintiff Bryan Casler-Tyrrell's medical history was significant for scoliosis and associated spinal fusion surgery in 2013.

9.      Plaintiff Bryan Casler-Tyrrell was then seen and examined by Defendant Suslik.

10.     His vital signs included a temperature of 100.8F, blood pressure of 141/82, pulse of 125, and respiration of 20.

11.     On physical examination, he had a normal head and neck examination with full range of motion in his neck and no cervical spine tenderness.

12.     His hip and leg examination was also within normal limits, and Defendant Suslik noted that there was a scar from past surgery on his lower spinal column.

13.     Notably, he had no noted neurological symptoms.

14.     Following the physical examination, Defendant Suslik formed a differential diagnosis that included urinary tract infection, pyelonephritis, and kidney stones.

15.     Defendant Suslik ordered tests, including a urine dipstick, urine culture, and abdominal x-ray.

16.     The urine dipstick showed trace leukocytes, protein, and blood.

17.     The abdominal x-ray was normal.

18.     Skaneateles Urgent Care did not have the capacity to analyze a urine culture, so

Plaintiff Bryan Casler-Tyrrell's urine culture was sent to Defendant Auburn C.H.'s lab for analysis.

19.     Defendant Suslik also ordered a Toradol shot for Plaintiff Bryan Casler-Tyrrell's alleged pain.

20.     After obtaining the results of the urine dipstick and x-ray, Defendant Suslik diagnosed Plaintiff Bryan Casler-Tyrrell with acute cystitis and back pain, and she prescribed the antibiotic Bactrim.

21.     Plaintiffs were told to call in two or three days to obtain the urine culture results, to schedule a follow-up appointment with his primary care physician in seven-to-ten days, and to go to the emergency room if his condition worsened.

22.     Defendant Koenig did not see Plaintiff Bryan Casler-Tyrrell at any time.

23.     The urine culture results were returned on February 20, 2017, and showed few colonies of mixed growth that were consistent with skin flora, but were otherwise negative.

24.     These results were reported to Plaintiff Julie Casler-Tyrrell along with an instruction to discontinue Bactrim.

25.     On February 25, 2017, Plaintiff was a passenger in a vehicle driving back to Syracuse from Georgia when he became confused, febrile, and tachycardic, and started seizing.

**Defendant Koenig's Role**

26.     Defendant Koenig was, and remains, the medical director for Skaneateles Urgent Care.

27.     In his role as medical director, Defendant Koenig is required to review and sign off on all charts created by midlevel providers, including nurse practitioners.

28.     This review is, in part, to determine if a chart is complete and whether the

        resulted

labs were followed up on, if required.[10]

29.     If the chart is complete, Defendant Koenig signs it so that Defendant Auburn C.H.

can bill for the visit.

30.     If the chart is not complete or labs have not been followed up on, Defendant

Koenig will speak with the treatment providers.

31.     In this instance, Defendant Koenig reviewed Defendant Suslik's chart for Plaintiff

Bryan Casler-Tyrrell.

32.     Defendant Koenig determined that Defendant Suslik's chart contained the

necessary documentation and that the urine culture had been appropriately addressed.[11]

---

[10]     Although Plaintiffs do not dispute that Defendant Koenig's review was for these purposes, they dispute that the review was solely for these purposes and not also to determine whether the provided care was medically appropriate.  (Dkt. No. 60, Attach. 20, at ¶ 29 [Pls.' Rule 56.1 Resp.].)  Notably, in deposition testimony cited by Plaintiffs in support of their partial denial, Dr. Iannolo testified that Defendant Koenig "would review them for the completeness of the documentation, the appropriateness of treatment for diagnosis provided, and he would review them to see if there was any other outstanding tests that might need to be followed up on."  (Dkt. No. 60, Attach. 8, at 59-60 [Iannolo Dep.].)  Defendant Koenig's own deposition testimony is likewise somewhat unclear as to whether he reviewed the appropriateness of the medical care provided (and if so, to what extent).  (Dkt. No. 58, Attach. 11, at 24-26, 51-52, 54, 58-60 [Koenig Dep.].)  Thus, Plaintiffs have provided evidence to show that there is a genuine dispute of material fact as to precisely what assessment Defendant Koenig performed when he reviewed Plaintiff Bryan Casler-Tyrrell's patient chart.

[11]     Plaintiffs admit the asserted fact but deny that the chart contained the necessary documentation.  (Dkt. No. 60, Attach. 20, at ¶ 33 [Pls.' Rule 56.1 Resp.].)  However, the evidence cited by Plaintiffs does not support that any documentation regarding the care that actually provided was missing; rather, it reflects testimony that Defendants failed to conduct certain tests or provide additional medical care.  Additionally, nothing in the cited testimony contradicts Defendant Koenig's evidence that he personally found that the chart contained the necessary documentation.  This fact is therefore deemed admitted.

33.     He therefore signed the chart on February 22, 2017.

**Plaintiffs' Expert Disclosure**

34.     On or about December 13, 2019, Plaintiffs served their expert disclosure pursuant

to Fed. R. Civ. P. 26(a)(2).

35.     This disclosure was more than 400 pages in length and identified seven

expert witnesses Plaintiffs intended to call at trial.

36.     Plaintiffs' liability experts, Carrie Tibbles, M.D., Alan Sanders, M.D., and Jason

Sheehan, M.D., were each deposed.

37.     Each of these three experts admitted that their respective expert reports did not

state that Defendant Koenig in particular deviated from the standard of care.

38.     After repeatedly admitting during her deposition that her expert report did not

state that Defendant Koenig had deviated from the standard of care, Dr. Tibbles then testified

that Defendant Koenig's care was substandard because he failed to take the opportunity when

reviewing Plaintiff Bryan Casler-Tyrrell's chart to address the alleged substandard care provided

by Defendant Suslik.

39.     Dr. Tibbles admitted that this opinion was not contained in her report.[12]

40.     Further, Dr. Tibbles also admitted that she had not reviewed any of the

deposition testimony in this case, including the depositions of Defendant Koenig, Defendant

Suslik, or Dr. Iannolo, before her deposition.

---

[12]     Plaintiffs deny that Dr. Tibbles' expert report does not state that Defendant Koenig deviated from the standard of care, or that her testimony at the deposition was the first time she expressed an opinion about Dr. Koenig.  (Dkt. No. 60, Attach. 20, at ¶¶ 40-41 [Pls.' Rule 56.1 Resp.].)  However, Plaintiffs' denial is contradicted by Dr. Tibbles' own deposition testimony, and by their subsequent admission of asserted fact no. 39.  (Dkt. No. 58, Attach. 18, at 4, 6-10 [Tibbles Dep.].)  These facts are all therefore deemed admitted.

41.     All of Plaintiffs' experts admitted that Plaintiff did not have meningitis on February 18, 2017.

## Defendant Koenig's Expert Report

42.     Stephen Schultz, M.D., a board-certified family medicine physician, opined that Defendant Koenig did not deviate from the standard of care regarding Plaintiff Bryan Casler-Tyrrell's treatment.

43.     Dr. Schultz opined that Defendant Koenig appropriately reviewed the chart prepared by Defendant Suslik related to Plaintiff Bryan Casler-Tyrrell's treatment in his capacity as medical director for Skaneateles Urgent Care.

44.     Dr. Schultz opined that the procedure used by Defendant Koenig to review midlevel and physician extender charts was consistent with the standard of care.

45.     Dr. Schultz opined that it was proper to review that chart for completeness and to make sure that labs were followed up on before signing the chart.

46.     Dr. Schultz further opined that Defendant Koenig properly performed this review.

47.     Dr. Schultz opined that Defendant Koenig was not reviewing the chart as a treating physician, given that Defendant Koenig had never seen or treated Plaintiff Bryan Casler-Tyrrell.

48.     Dr. Schultz opined that Defendant Koenig reviewed Defendant Suslik's chart to ensure that the necessary documentation was present, including the urine culture results.

49.     Dr. Schultz opined that Defendant Suslik's chart was complete, and thus it was appropriate for Defendant Koenig to sign it.

50.     In addition, Dr. Schultz opined that the standard of care did not require Defendant

Koenig to provide additional follow-up care or to order additional testing after he reviewed the chart.

51.     Dr. Schultz opined that the determination of what tests a particular patient needs should be made by the treating providers.

52.     Dr. Shultz opined that Defendant Koenig was not Plaintiff Bryan Casler-Tyrrell's treating provider, and thus the standard of care did not require that he order any additional tests to look for infection.

53.     Similarly, Dr. Schultz opined that Defendant Koenig did not need to provide additional follow-up treatment after seeing the negative urine culture results.

54.     Plaintiff had already been advised by Defendant Suslik to follow up with his primary care physician, and to go to the emergency room if he experienced any worsening in his symptoms.

55.     Dr. Schultz opined that this instruction was the standard of care, and thus Defendant Koenig was not required to provide any additional follow-up treatment.

56.     Like Plaintiffs' experts, Dr. Schultz agreed that Defendant Koenig did not err in failing to diagnose Plaintiff Bryan Casler-Tyrrell with meningitis on February 18, 2017.

57.     Dr. Schultz listed the symptoms of meningitis, which include headache, stiff neck,

high sudden fever, confusion, photosensitivity, nausea, and vomiting.

58.     Plaintiff had none of these symptoms when he presented to Skaneateles Urgent Care on February 18, 2017; he denied headache, stiff neck and nausea, there was no evidence of photosensitivity or confusion, and his neurological exam was normal.

59.     Dr. Schultz opined that, because none of the symptoms of meningitis were present

or documented in the chart, Defendant Koenig could not have departed from acceptable medical

standards by failing to diagnose Plaintiff Bryan Casler-Tyrrell with meningitis on February 18,

2017.

60.     Dr. Schultz opined that Defendant Koenig was not a cause of Plaintiff Bryan

Casler-Tyrrell's injuries or damages.

61.     Dr. Schultz opined that Defendant Koenig did not see Plaintiff Bryan Casler-

Tyrrell or provide any treatment to him, and was not responsible for determining any diagnoses.

62.     Dr. Schultz opined that, since Defendant Koenig did not see Plaintiff Bryan

Casler-Tyrrell and had no duty to examine or treat him, any alleged improper examination or

failure to diagnose by Defendant Koenig could not be the cause of Plaintiff Bryan Casler-

Tyrrell's injuries.

63.     Moreover, Dr. Schultz opined that the symptoms reported by Plaintiff Bryan

Casler-Tyrrell on February 18, 2017, were nonspecific and did not support a diagnosis of

meningitis.

64.     Plaintiff Bryan Casler-Tyrrell did not show any signs or symptoms of meningitis

until February 25, 2017, three days after Defendant Koenig reviewed the chart.

65.     In addition, Dr. Schultz opined that the treatment Defendant Koenig would have

rendered if he had concerns after reviewing the chart would have been to follow up with his

primary care physician and to go to the emergency room if his condition worsened.

66.     Dr. Schultz opined that this was the same treatment and instructions that were

provided to Plaintiff Bryan Casler-Tyrrell by Defendant Suslik.

67.     Therefore, Dr. Schultz opined that Defendant Koenig could not have caused Plaintiff Bryan Casler-Tyrrell's injuries, given that Plaintiff Bryan Casler-Tyrrell had already been provided the proper instructions to receive follow-up care when he was discharged.

### F.     Parties' Briefing on Defendant Auburn C.H.'s Motion for Summary Judgment and Plaintiffs' Cross-Motion for Summary Judgment Against Defendant Auburn C.H.

#### 1.     Defendant Auburn C.H.'s Memorandum of Law

Generally, in its motion for summary judgment, Defendant Auburn C.H. argues that the Court should dismiss any claim of independent or direct liability against it because Plaintiffs have not asserted any basis for direct or independent liability against it, but rather have asserted only a basis for vicarious liability against it (i.e., based on the actions of the other Defendants). (Dkt. No. 57, Attach. 16, at 4-10 [Def. Auburn C.H.'s Mem. of Law].)  More specifically, Defendant Auburn C.H. argues that, although it owns Skaneateles Urgent Care, its contract with Defendant EFLEMC shows that (a) Defendant EFLEMC is an independent entity that is responsible for all of the care provided at that location, (b) none of the employees of Defendant EFLEMC who worked at Skaneateles Urgent Care are employees of Defendant Auburn C.H., and (c) all of the alleged actions were committed by employees of Defendant EFLEMC.  (*Id.*) Additionally, Defendant Auburn C.H. argues that the contract indemnifies it from any damages resulting from the actions of Defendant EFLEMC and its employees, and that none of the expert witnesses have opined that Defendant Auburn C.H. itself deviated from any standard of care or caused Plaintiffs' injuries.  (*Id.*)

#### 2.     Plaintiffs' Opposition Memorandum of Law and Cross-Motion

Generally, in their response to Defendant Auburn C.H.'s motion and their cross-motion for summary judgment, Plaintiffs make three arguments.  (Dkt. No. 59, Attach 18, at 9-16 [Pls.'

Opp'n Mem. of Law].)  First, Plaintiffs argue that Defendant Auburn C.H. cannot escape

liability because it had a non-delegable duty under New York law to provide acceptable

standards of care at its urgent care facilities, even if it contracted another entity to actually

perform the services at those facilities.  (*Id.* at 9-12.)

Second, Plaintiffs argue that Defendant Auburn C.H. should be estopped from claiming it

is not responsible for the negligent acts of the co-Defendants because, even if Defendant

EFLEMC is considered an independent contractor, Defendant Auburn C.H. can be held liable

where, as here, a patient sought medical care at the hospital as opposed to from any particular

physician, and apparent or ostensible agency existed.  (*Id.* at 12-14.)

Third, Plaintiffs argue that Defendant Auburn C.H. is vicariously liable for the actions of

its co-Defendants based on a doctrine under New York law that holds hospitals liable for the

actions of individuals they hire to staff hospital facilities.  (*Id.* at 15-16.)

### 3. Defendant Auburn C.H.'s Reply Memorandum of Law and Opposition to Plaintiffs' Cross-Motion

Generally, in its reply and opposition, Defendant Auburn C.H. makes three arguments.

(Dkt. No. 61, at 4-13 [Def. Auburn C.H.'s Reply Mem. of Law].)  First, Defendant Auburn C.H.

argues that Plaintiffs have not opposed the substance of its motion for summary judgment

(which was that there is no evidence of independent or direct negligence by Defendant Auburn

C.H.) and therefore have not articulated a basis for the Court to deny its motion.  (*Id.* at 4-5.)

Second, Defendant Auburn C.H. argues that there is no basis for Plaintiffs' argument that

Defendant Auburn C.H. had a non-delegable duty because the cases cited by Plaintiffs in support

of their argument involve different factual circumstances, and there is more apposite case law

that indicates that a hospital is not liable for the torts of independent providers.  (*Id.* at 5-6.)

18

Third, Defendant Auburn C.H. argues that there is an insufficient basis to find, as a matter of law, that it is vicariously liable for the actions of its co-Defendants.  (*Id.* at 7-13.) More specifically, Defendant Auburn C.H. argues that the New York common law doctrine cited by Plaintiffs does not apply in this case due to the fact that Plaintiffs sought care at an urgent care center, not the hospital's emergency room (which was also open at the relevant time, but at which Plaintiffs chose not to seek care).  (*Id.*)  Defendant Auburn C.H. also argues that liability is not the strict liability that Plaintiffs assert, but rather liability is contingent on the level of supervision and control the hospital exercised over the entity or individual providing the care (among other factors related to assessing an agency relationship), and contingent on some appearance that the physician or other provider is acting as the hospital's agent, something that is not present in this case.  (*Id.*)  Finally, Defendant Auburn C.H. argues that the contract between it and Defendant EFLEMC does not establish vicarious liability as a matter of law, and all of the evidence shows that it was in fact Defendant EFLEMC that managed Skaneateles Urgent Care, and employed, supervised and controlled the providers who worked there.  (*Id.*)

### G.     Parties' Briefing on Defendant Koenig's Motion for Summary Judgment and Plaintiffs' Cross-Motion Against Defendant Koenig

#### 1.     Defendant Koenig's Memorandum of Law

Generally, in his motion for summary judgment, Defendant Koenig makes four arguments.  (Dkt. No. 58, Attach. 22, at 6-15 [Def. Koenig's Mem. of Law].)  First, Defendant Koenig argues that the evidence does not sufficiently support a finding that he deviated from the standard of care because his expert, Dr. Schultz, opined as follows: (a) he met the standard of care as the medical director of Skaneateles Urgent Care by reviewing the chart for completeness; (b) he did not fail to diagnose meningitis because there was no evidence that Plaintiff Bryan Casler-Tyrrell had meningitis on February 18, 2017; and (c) the applicable standard of care for a

non-treating, non-examining physician medical director did not include an obligation to provide follow-up testing or care, and the only follow-up testing or care that would have been provided under the circumstances would have been to tell Plaintiffs to follow-up with a treating physician or the emergency room if his symptoms worsened.  (*Id.* at 6-11.)

Second Defendant Koenig argues that Plaintiffs have not shown that he was the cause of Plaintiff Bryan Casler-Tyrrell's injuries because (a) he did not treat Plaintiff Bryan Casler-Tyrrell, but merely reviewed his chart, and (b) the only follow-up testing or care he could have provided was to instruct Plaintiffs to follow-up with a treating physician or go to the emergency room if his symptoms worsened, and that instruction was indeed provided to Plaintiffs upon discharge from Skaneateles Urgent Care on February 18, 2017.  (*Id.* at 11-12.)

Third, Defendant Koenig argues that Plaintiffs cannot create a genuine dispute of fact as to their claims against him because they have not provided any expert opinions related to his responsibilities to Plaintiffs or the standard of care applicable to him as a non-treating, non-examining medical director.  (*Id.* at 12-15.)  More specifically, Defendant Koenig argues that the only expert source who mentioned Dr. Koenig or his liability was Dr. Tibbles, but that opinion was disclosed for the first time in her deposition, was not disclosed in her initial expert report, was not based on an evidentiary foundation because she had not reviewed Dr. Koenig's deposition testimony at the time of her deposition, and was not included in a timely-served supplemental expert report.  (*Id.*)  Defendant Koenig therefore argues that Dr. Tibbles' opinion about his liability exceeds the scope of her expert report and lacks foundation, and should not be admitted for consideration.  (*Id.*)

Fourth, Defendant Koenig argues that any alleged violations of New York statutes cited by Plaintiffs in their Amended Complaint or their Answers to Interrogatories cannot impose

liability on Defendant Koenig because those statutes apply to hospitals or facilities, and not to individual providers. (*Id.* at 15.)

### 2.   Plaintiffs' Opposition Memorandum of Law and Cross-Motion

Generally, in their opposition and cross-motion, Plaintiffs make four arguments. (Dkt. No. 60, Attach. 19, at 6-18 [Pls.' Opp'n Mem. of Law].) First, Plaintiffs argue that the evidence shows that Defendant Koenig had a duty to review the care provided by the midlevel providers to ensure that it met the accepted standard of care because (a) the contract between Defendant Auburn C.H. and Defendant EFLEMC required such oversight, (b) Defendant Koenig himself has attested and testified that his review involves a determination of whether a patient received appropriate medical care and that he had on many occasions made suggestions about further or different care he thought was warranted after reviewing charts, (c) Dr. Iannolo also testified that the chart review involves assessing more than mere completeness, and (d) Dr. Schultz's opinion is inconsistent with the evidence that he purports to rely on and should therefore not be afforded much weight. (*Id.* at 6-9.)

Second, Plaintiffs argue that Defendant Koenig's failure to advise Plaintiff Bryan Casler-Tyrrell to seek immediate follow-up medical care after reviewing his chart was a substantial factor in Plaintiff Bryan Casler-Tyrrell's injuries. (*Id.* at 9-12.) More specifically, Plaintiffs argue that (a) all of the expert reports indicate that there was no basis for a diagnosis of urinary tract infection, that his vital signs were indicative of an infectious process, and that he was known during the time of treatment to have spinal hardware, yet Defendant Suslik failed to consider any other type of bacterial infection, did not document her back examination in detail, and did not order any blood work, and (b) given that it is undisputed that Defendant Koenig claims to have reviewed the entirety of Plaintiff Bryan Casler-Tyrrell's chart, a reasonable

factfinder could conclude that his review should have alerted him to the existence of an infectious process that had not been adequately assessed or treated.  (*Id.*)

Third, Plaintiffs argue that Dr. Tibbles' expert opinion creates a genuine dispute of material fact as to whether Defendant Koenig deviated from the standard of care, and that Defendant Koenig cannot claim that this opinion is a surprise, given that it was clearly laid out at her deposition and his counsel had an opportunity to question her about that opinion.  (*Id.* at 13.)

Fourth, Plaintiffs argue that they should be permitted to present Dr. Tibbles' opinions about Defendant Koenig's liability to the jury even though they failed to submit a timely supplemental expert report regarding those opinions because their violation of the Federal Rules of Civil Procedure was merely technical, substantially justified, and harmless to Defendant Koenig.  (*Id.* at 14-18.)  More specifically, Plaintiffs argue that (a) the violation was justified because the effects of the COVID-19 pandemic on Dr. Tibbles' practice caused a significant delay in obtaining the transcript of her deposition and a supplemental expert report, and (b) Defendant Koenig is not prejudiced by its introduction given that (i) Dr. Tibbles' opinions in the supplemental expert report are identical to those she expressed at her deposition, and (ii) Defendant Koenig and his counsel were present at that deposition and were able to question her about her opinions.  (*Id.*)

### 3.     Defendant Koenig's Reply Memorandum of Law and Opposition to Plaintiffs' Cross-Motion

Generally, in reply to Plaintiffs' opposition and in response to Plaintiffs' cross-motion, Defendant Koenig makes three arguments.  (Dkt. No. 62, at 5-20 [Def. Koenig's Reply Mem. of Law].)  First, Defendant Koenig argues that the Court should preclude Plaintiffs from using Dr. Tibble's undisclosed deposition opinions and supplemental expert report because there is no justification for Plaintiffs' failure to make a timely disclosure of that evidence.  (*Id.* at 5-13.)

More specifically, Defendant Koenig argues that Plaintiffs were aware of a need to supplement in July 2020 (when the deposition was conducted and it was clear she had testified beyond the scope of her initial expert opinion), but failed to provide any indication that they intended to file a supplemental expert report (and, indeed, expressed that they did not intend to supplement) until after the discovery deadline had passed and Defendant Koenig had filed his motion for summary judgment.  (*Id.*)  Defendant Koenig further argues that the evidence available (including Plaintiffs' counsel's own declarations) shows that they did not request that Dr. Tibbles supplement her expert opinion until October 2020, which was after discovery had already closed.  (*Id.*)  Defendant Koenig argues that the failure to disclose is prejudicial to him because he did not have an opportunity to ask questions based on these new opinions and he prepared his motion for summary judgment under the impression that no supplemental expert report was forthcoming.  (*Id.*)  Defendant Koenig argues that exclusion of this evidence is the appropriate remedy because (a) there is no reasonable explanation for the failure to make a timely disclosure and indeed there is a suggestion of bad faith in Plaintiffs' delay, (b) the undisclosed opinions are prejudicial and Defendant Koenig has had no opportunity to test them through adequate questioning, and (c) there is no possibility of a continuance in this matter given the length of time this case has been pending and the fact that the Court has expressed that no further extensions of discovery will be granted.  (*Id.*)

Second, Defendant Koenig argues that Plaintiffs have abandoned their claims about statutory violations, that he should have ordered certain further tests or imaging, and that he failed to properly examine Plaintiff Bryan Casler-Tyrrell because they have not made any counter-arguments and have not addressed the expert opinion evidence that supports Defendant Koenig's position on those issues.  (*Id.* at 13-14.)

Third, Defendant Koenig argues that Plaintiffs have failed to raise a genuine dispute of material fact related to their claims against Defendant Koenig because (a) their experts have not defined the standard of care that was applicable to him as a non-treating, non-examining medical director, (b) there is no evidence that Defendant Koenig reviewed the patient charts for anything other than billing purposes, and (c) even if Dr. Tibbles' supplemental expert opinions are deemed admissible despite their untimely disclosure, her conclusions lack an evidentiary foundation, her assumptions are contradicted by the other evidence, and she does not actually opine that Defendant Koenig was a substantial cause of Plaintiff Bryan Casler-Tyrrell's injuries or how different appropriate care or instructions from Defendant Koenig would have caused a different outcome.  (*Id.* at 14-21.)

## II.   LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[13]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.

---

[13]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).[14]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[255]  (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.).[15]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules.[16]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material

---

[14]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

[15]     *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[16]     *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[17]–even where the non-movant was proceeding *pro se*.[18]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[19]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested

---

[17]     Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1(b).

[18]     *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

[19]     *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct.

30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL

2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.    ANALYSIS

### A.    Whether Defendant Auburn C.H. Is Entitled to Summary Judgment as to any Claims Against It Based on Direct or Vicarious Liability

After careful consideration, the Court answers this question in the affirmative for the

reasons stated in Defendant Auburn C.H.'s memoranda of law.  *See, supra*, Part I.C.1 and 3.  To

those reasons, the Court adds the following analysis.

#### 1.  Direct Liability

As an initial matter, the Court notes that Defendant Auburn C.H. has not moved for complete

dismissal of the claims against it in its summary judgment motion; rather, it has moved for

summary judgment only as to the claims against it that are based on a theory of direct liability.

(Dkt. No. 57, Attach. 16, at 7 [Def. Auburn C.H.'s Mem. of Law].)  Specifically, Defendant

Auburn C.H. argues that the alleged deficient treatment and warnings were provided by

Defendant EFLEMC and its employees, not Defendant Auburn C.H., and thus there is no basis

for finding direct liability against Defendant Auburn C.H.  (Dkt. No. 57, Attach. 16, at 7-9 [Def.

Auburn C.H.'s Mem. of Law].)  Plaintiffs counter that Defendant Auburn C.H. is directly liable

because, even if Defendant EFLEMC were to be found to be an independent contractor, the duty

to provide medical care meeting acceptable standards is non-delegable and thus any deviation

from the standard of acceptable care by the co-Defendants would render Defendant Auburn C.H.

directly liable for Plaintiffs' resulting injuries.  (Dkt. No. 59, Attach. 18, at 5, 9-12 [Pls.' Opp'n

Mem. of Law].)

However, whether a defendant is liable for the acts of an independent contractor due to the existence of a nondelegable duty is an issue of vicarious liability, not direct liability.  *See Dziedzic v. Wirth*, 79 N.Y.S.3d 822, 823 (N.Y. App. Div. 4th Dept. 2018) ("A party may be *vicariously* liable for the negligence of an independent contractor in performing non-delegable duties . . . arising out of some relation toward the public or the particular plaintiff.") (emphasis added) (internal quotation marks omitted).  The Court therefore agrees with Defendant Auburn C.H. that Plaintiffs have failed to provide any real opposition to the actual substance of Defendant Auburn C.H.'s motion for partial summary judgment.  Additionally, the Court has not found any admissible record evidence to support the existence of a basis for imposing direct liability on Defendant Auburn C.H. in this matter.  Notably, it is undisputed that all of the sources who were involved in Plaintiff Bryan Casler-Tyrrell's treatment on February 18, 2017, were employees of Defendant EFLEMC and not employees of Defendant Auburn C.H., and that Defendant EFLEMC is an independent entity from Defendant Auburn C.H.  Moreover, no evidence has been proffered to show that Defendant Auburn C.H. in any way directed, influenced, or was involved in the actions of Defendants EFLEMC, Suslik, or Koenig related to the treatment Plaintiff Bryan Casler-Tyrrell received.  As a result, the Court finds that Plaintiffs have not created a genuine dispute of material fact as to whether Defendant Auburn C.H. committed acts which would make it directly liable for the alleged injuries sustained by Plaintiffs.  Defendant Auburn C.H.'s motion for partial summary judgment as to any asserted claims of direct liability is therefore granted.

### 2. Vicarious Liability

Although Defendant Auburn C.H. has not moved for summary judgment on any claims of vicarious liability, Plaintiffs have filed a cross-motion for summary judgment seeking a finding

that Defendant Auburn C.H. is vicariously liable as a matter of law.  (Dkt. No. 59, Attach. 18 [Pls.' Opp'n Mem. of Law].)  They argue that three bases exist for finding the existence of vicarious liability: (1) even if Defendant EFLEMC was an independent contractor, the duty to provide an acceptable standard of care is a nondelegable duty under New York law; (2) Defendant Auburn C.H. should be estopped from asserting it is not liable for the actions of Defendant EFLEMC because of the existence of apparent or ostensible agency; and (3) under the doctrine in *Mduba v. Benedictine Hosp.*, 384 N.Y.S.2d 527 (N.Y. App. Div. 3rd Dept. 1976), Defendant Auburn C.H. is liable for the actions of Defendant EFLEMC and its employees because it contracted with Defendant EFLEMC to staff Skaneateles Urgent Care, and Plaintiffs sought care from the urgent care facility itself rather than from any specific physician at the urgent care facility.  (*Id.*)

"The general rule is that a party who retains an independent contractor, as distinguished from a mere employee or servant, is not liable for the independent contractor's negligent acts," subject to a host of exceptions.  *Kleeman v. Rheingold*, 598 N.Y.S.2d 149, 152 (N.Y. 1993); *see Garofolo v. New York*, 135 A.D.3d 1108, 1109 (N.Y. App. Div. 3rd Dep't 2016) ("Traditionally, a hospital or medical facility is liable only for the medical malpractice of its employees and not that of independently contracted doctors.").  These exceptions generally fall into three categories: (1) where there is negligence by the employer when selecting, instructing, or supervising the contractor; (2) where the work involved is especially or inherently dangerous; and (3) where the employer has a specific nondelegable duty.  *Kleeman*, 598 N.Y.S.2d at 152.

### a.  The Relationship Between Defendant Auburn C.H. and Defendant EFLEMC

As an initial matter, the Court finds that there is at least a genuine dispute of material fact as to whether Defendant EFLEMC was an independent contractor rather than an employee.

Under New York law, "[c]ontrol of the method and means by which the work is to be done is the critical factor in determining whether one is an independent contractor or an employee for the purposes of tort liability," and "[f]actors relevant to assessing control include whether a worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll, and (5) was on a fixed schedule." *Sanabria v. Aguero-Borges*, 117 A.D.3d 1024, 1025 (N.Y. App. Div. 2d Dep't 2014). Although "the existence of a contract designating a person as an independent contractor is not dispositive, it is a factor to be considered. *Sanabria*, 117 A.D.3d at 1026. Additionally, "the mere retention of general supervisory powers over an independent contractor cannot form a basis for the imposition of liability against the principal." *Goodwin v. Comcast Corp.*, 42 A.D.3d 322, 323 (N.Y. App. Div. 1st Dep't 2007).

"The issue of an employer/employee relationship 'usually presents a question of fact, but when the evidence in the record on the issue of control is undisputed, the matter may properly be determined by the court as a matter of law.'" *Tesillo v. Emergency Physician Assocs., Inc.*, 376 F. Supp. 2d 327, 333 (W.D.N.Y. 2005) (quoting *Berger v. Dykstra*, 203 A.D.2d 754 [1994]). As a result, "the issue of control is an issue of material fact because it is determinative, and if the extent of control is disputed, the issue should be submitted to the jury." *Tesillo*, 376 F. Supp. 2d at 333 (citing *Felice v. St. Agnes Hosp.*, 65 A.D.2d 388, 396 [1978]).

Here, it is not apparent that Plaintiffs specifically dispute that Defendant EFLEMC is an independent contractor rather than an employee of Defendant Auburn C.H. Rather, Plaintiffs' primary argument is that Defendant Auburn C.H. cannot avail itself of any independent contractor defense because (a) it had a non-delegable duty to provide medical care in accordance with the legal standard of care, and (b) Skaneateles Urgent Care held itself out to the community

as an entity of Defendant Auburn C.H.  (Dkt. No. 59, Attach. 18 [Pls.' Opp'n Mem. of Law].)

Because neither Defendant Auburn C.H. nor Plaintiffs have requested summary judgment on the

issue of whether Defendant EFLEMC was an independent contractor of Defendant Auburn C.H.

as a matter of law, the Court declines to reach that issue here.  Instead, the Court assumes for the

purposes of this motion (but without deciding, as discussed) that the relationship between those

two Defendants is that of an independent contractor, and thus will determine whether any of the

bases raised by Plaintiffs for asserting vicarious liability over an independent contractor are

applicable here.

### b.  The Existence of a Nondelegable Duty

 Although there is no clearly defined criteria for identifying which duties are nondelegable,

"[t]he most cited formulation is that a duty will be deemed nondelegable when the responsibility

is so important to the community that the employer should not be permitted to transfer it to

another."  *Kleeman*, 598 N.Y.S.2d at 152-53 (internal quotation marks omitted).

Plaintiffs argue that Defendant Auburn C.H. had a non-delegable duty to ensure that the care

provided at Skaneateles Urgent Care met the generally accepted standards of professional

practice based on 10 N.Y.C.R.R. §§ 405.2(f)(1) and (h), N.Y. Pub. Health L. § 2803-a, and

public policy considerations.  (Dkt. No. 59, Attach. 18, at 9-12 [Pls.' Opp'n Mem. of Law].)

Pursuant to 10 N.Y.C.R.R. §§ 405.2, "[t]he established operator [of a hospital] shall be

legally responsible for the quality of patient care services," and the governing body of the

hospital must require that "every patient of the hospital, whether an inpatient, emergency

services patient, or outpatient, shall be provided care that meets generally acceptable standards

of professional practice."  10 N.Y.C.R.R. §§ 405.2(a), (f)(1).  This regulation also provides that

"[t]he governing body [of the hospital] shall be responsible for services furnished *in the hospital*

whether or not they are furnished by outside entities under contracts." 10 N.Y.C.R.R. § 405.2(h) (emphasis added).

Notably, these regulations all apply to care provided to patients by the hospital or received at the hospital. Plaintiffs' argument is, for all intents and purposes, premised on the assumption that Skaneateles Urgent Care is indistinguishable from the hospital itself, in the same way that a hospital's emergency department is indistinguishable from the hospital. Defendant Auburn C.H. argues at least implicitly that Skaneateles Urgent Care is separate from the hospital. Because the above-referenced regulations indicate that a hospital has a nondelegable duty for services provided within the hospital itself, one relevant question regarding the existence of a nondelegable statutory duty is whether Skaneateles Urgent Care can be defined as part of the hospital itself. Another relevant question is whether Skaneateles Urgent Care is considered an "outpatient" service of the hospital such that patients of Skaneateles Urgent Care are considered patients of Defendant Auburn C.H. However, there is a genuine dispute of material fact between the parties as to whether services furnished at Skaneateles Urgent Care would qualify as services furnished by Defendant Auburn C.H. or "in the hospital," given the parties' disagreement about the degree of control Defendant Auburn C.H. exercised over Defendant EFLEMC's operation of Skaneateles Urgent Care.

As to whether there is a nondelegable duty based on public policy considerations, the Court notes that Plaintiffs have not provided the Court with citations to any New York case law recognizing such specific duty. However, even if Plaintiffs had done so, there would remain a genuine dispute of material fact related to the extent to which Defendant Auburn C.H. controlled the various operations and patient care at Skaneateles Urgent Care (and whether patients at Skaneateles Urgent Care were in fact patients of Defendant Auburn C.H.) that would preclude

the Court from finding that any such applicable duty existed under the circumstances of this case.  As a result, the Court finds that summary judgment in Plaintiff's favor is not warranted on the basis of an alleged nondelegable duty of a hospital to provide adequate care to its patients.

### c.   *Mduba* Doctrine and Agency by Estoppel

Similarly, based on the evidence presented with the motions, the Court declines to find, as a matter of law, that Defendant Auburn C.H. is vicariously liable under either the principles of agency by estoppel or the *Mduba* doctrine.  In *Mduba*, the New York Supreme Court Appellate Division Third Department found that the defendant hospital could be held liable for a physician's negligence (even if he was an independent contractor) where that physician operated the hospital's emergency room and the hospital held itself out to the public as an institution that provided doctors, staff, and facilities for emergency treatment, regardless of the terms of the contract between the hospital and the physician.  *Mduba*, 384 N.Y.S.2d at 453-54.  In other words, "a hospital may be held vicariously liable for the acts of independent physicians if the patient enters the hospital through the emergency room and seeks treatment from the hospital, not from a particular physician."  *Goffredo v. St. Luke's Cornwall Hosp.*, 142 N.Y.S.2d 597, 598 (N.Y. App. Div. 2d Dep't. 2021) (finding summary judgment should have been granted as to vicarious liability where the plaintiff demonstrated that she was brought to the hospital's emergency room, did not request care by a particular physician, and was assigned the relevant independent physician).

Somewhat similarly, New York courts recognize the doctrine of agency by estoppel, such that "a hospital or entity . . . may be vicariously liable for the medical malpractice of independent contractors in certain circumstances based on a theory of 'agency or control in fact, or apparent or ostensible agency.'"  *Garofolo*, 135 A.D.3d at 1109 (quoting *Kavanaugh v.*

*Nussbaum*, 71 N.Y.2d 535, 547 [1998]).  The existence of ostensible agency depends on "whether the plaintiff could have reasonably believed, based upon all of the surrounding circumstances, that the treating physician was provided by the defendant . . . or was otherwise acting on the defendant's behalf"; "words and conduct" on the part of the defendant "that give rise to the appearance and belief that the doctors were acting on its behalf" are "essential to such a claim." *Garofolo*, 135 A.D.3d at 1109-10 (citing *Hallock v. State of New York*, 64 N.Y.2d 224, 231 [1984]; *Soltis v. State of New York*, 172 A.D.2d 919, 920 [1991]).  However, the use of hospital letterhead for reports, the failure to affirmatively state that the physician is not an employee of the hospital, and the presence of the physician on a hospital website are not generally sufficient, in and of themselves, to establish ostensible agency; rather, there must have been some "misleading conduct upon which [the plaintiff] reasonably relied when they decided to accept medical services from [the physician]." *King v. Mitchell*, 819 N.Y.S.2d 169 (N.Y. App. Div. 3rd Dep't. 2006).  Indeed, "the plaintiff must reasonably rely on the appearance of authority, based on some misleading words or conduct by the principle, not the agent[, and] the plaintiff must accept the services of the agent in reliance upon the perceived relationship between the agent and the principle, and not on reliance on the agent's skill." *Loaiza v. Lam*, 968 N.Y.S.2d 548, 549-50 (N.Y. App. Div. 2d Dep't. 2013).  "Apparent/ostensible agency has been applied to hold a medical facility responsible for the malpractice of a physician providing services there, despite the physician's status as an independent contractor, where medical care was sought by a patient from the facility rather than from a particular physician." *Sanchez v. Master*, 82 N.Y.S.3d 836, 839 (N.Y. Supr. Ct. Bronx Cnty. 2018) (citing *Hill v. St. Clare's Hosp.*, 67 N.Y.2d 72 [N.Y. 1986]).

Defendant Auburn C.H. argues that these doctrines do not apply because Plaintiff Bryan

Casler-Tyrrell sought care from an urgent care facility, not from Defendant Auburn C.H.'s

emergency room, relying on generic information related to the types of services that urgent care

facilities typically provide compared with the services that an emergency room typically

provides.  (Dkt. No. 61, Attach. 1, at 7-8 [Def. Auburn C.H.'s Reply Mem. of Law].)  However,

although Defendant Auburn C.H. is correct that *Mduba* and other such cases overwhelmingly

involve care at a hospital's emergency room, its argument ignores the practical legal

underpinnings of the doctrines.  As discussed above, the doctrine is intended to hold a hospital

vicariously liable where the patient in question sought care from the hospital as an entity (as

opposed to from a specific physician) and was admitted as a patient of the hospital. Given that

neither party has presented case law indicating that the *Mduba* principle could not be logically

extended to facilities owned and operated by a hospital but staffed by independent contractors or

non-employees (but in which the patient is still considered a patient of the hospital itself), the

Court is skeptical that *Mduba* can apply only to emergency rooms.  However, even if *Mduba* is

limited to formal emergency rooms physically attached to a hospital, there is a genuine dispute

of material fact as to whether ostensible agency existed in this case, and such doctrine has not

been limited solely to emergency rooms by courts discussing or applying it.

Specifically, to establish ostensible agency, a plaintiff must show (1) that the principle

engaged in misleading words or conduct, and (2) that the plaintiff accepted the agent's services

and submitted to the agent's care in reliance on a belief that the agent was an employee of the

principal.  *Sampson v. Contillo*, 55 A.D.3d 588, 590 (N.Y. App. Div. 2d Dep't 2008).  In making

the determination of ostensible agency, "a court should consider all 'attendant circumstances . . .

to determine whether the patient could properly have believed that the physician was provided by the hospital.'" *Sampson*, 55 A.D.3d at 590.

Although Skaneateles Urgent Care was not physically attached to or located near Defendant Auburn C.H.'s hospital, the parties have provided evidence from which a reasonable factfinder could conclude that it acted as an extension of sorts of the hospital itself for the provision of certain urgent care services (regardless of whether the providers of those services were employees or independent contractors of Defendant Auburn C.H.). The contract between Defendant Auburn C.H. and Defendant EFLEMC states that Defendant Auburn C.H. "operates" Skaneateles Urgent Care (which provides "urgent medical services" to Cayuga County and the surrounding areas) and further shows that Defendant EFLEMC and its employees retained to staff Skaneateles Urgent Care are subject to not insubstantial direction and oversight by Defendant Auburn C.H. in terms of their duties, as well as that any personnel that are not supplied by Defendant EFLEMC will be employees or contractors of Defendant Auburn C.H. (Dkt. No. 57, Attach. 3, at 2-5.) Additionally, Defendant Auburn C.H. remains responsible for all billing of patients for services performed at Skaneateles Urgent Care and retains ownership of all medical records for patients treated there, and Skaneateles Urgent Care is required to use Defendant Auburn C.H.'s approved information systems. (*Id.* at 7-8.) Defendant Auburn C.H. also provides the space required for urgent care services (but reserves the right to itself use any of that space without consulting Defendant EFLEMC), the medical and office equipment for providing the urgent care services, and all utility and maintenance services for the provision of urgent care and related services. (*Id.* at 6.) The medical records related to the visit on February 18, 2017, consistently and prominently include the words "Auburn Community Hospital" and the hospital's logo and/or address, including on the patient information sheets related to generic

information about back pain and urinary tract infections.  (Dkt. No. 59, Attach. 4.)  Neither party

makes any argument or has provided any evidence that Plaintiff Bryan Casler-Tyrrell went to

Skaneateles Urgent Care with the intention of seeking care from a specific physician or mid-

level medical provider as opposed to from the facility in general.  In her affidavit, Plaintiff Julie

Casler-Tyrrell stated that she brought Plaintiff Bryan Casler-Tyrrell to Skaneateles Urgent Care

"to be treated by the Hospital," and that she believed, based upon "prior experience, . . . the

information that the Hospital provided to the community at large, . . . prior discharge instructions

and information, . . . pamphlets and literature available at the Clinic as well as the manner in

which the Hospital publicly presented itself" that the individuals working at Skaneateles Urgent

Care were employees of Defendant Auburn C.H.  (Dkt. No. 59, Attach. 14 [Julie Casler-Tyrrell

Aff.].)

From all of the above evidence, a reasonable factfinder could conclude that employees of

Defendant EFLEMC, working at Skaneateles Urgent Care, were the ostensible or apparent

agents of Defendant Auburn C.H.  However, because the relevant evidence could also

reasonably be interpreted as insufficiently showing "misleading words or conduct" specifically

by Defendant Auburn C.H. (as opposed to Defendant EFLEMC), the Court finds that it would be

inappropriate to find that Defendant Auburn C.H. is vicariously liable for the actions of

Defendant EFLEMC and its employees as a matter of law.  Such factual determinations are the

province of the jury.  As a result, Plaintiffs' motion for summary judgment on its claim of

vicarious liability against Defendant Auburn C.H. is denied.

      **A.**      **Whether the Court Should Exclude Opinions of Dr. Tibbles that Are Beyond
the Scope of Her Initial Expert Report**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant Koenig's memoranda of law.  *See, supra*, Part I.G.1. and 3.  To those reasons, the Court adds the following analysis.

Rule 26 of the Federal Rules of Civil Procedure requires that parties disclose the identities of any witness they may present at trial, and that expert witnesses, as part of those disclosures, must provide a written report that contains, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," and "the facts and data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2).  After an expert and his or her written report have been disclosed, such must be supplemented or corrected "in a timely manner if the party learns in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process."  Fed. R. Civ. P. 26(e)(1).  "[T]he party's duty to supplement extends both to information included in the report and to information given during the expert's deposition," and "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under [Fed. R. Civ. P. 26 (a)(3)] are due." Fed. R. Civ. P. 26(e)(2).

On October 17, 2019, the Court granted a request for extension of the discovery deadlines, pursuant to which Plaintiffs were required to disclose their expert reports by December 15, 2019, responsive expert reports were required to be disclosed by January 15, 2020,[20] rebuttal expert reports were due to be disclosed by March 1, 2020, expert depositions were to be completed by April 1, 2020, and all discovery was to be completed by April 1, 2020. (Dkt. No. 55 [Text Order filed Oct. 17, 2019].)  The Court noted that these revised deadlines

---

[20]     The deadline for responsive expert disclosure for Defendant Koenig was subsequently extended to January 31, 2020, by request.  (Dkt. No. 48 [Text Order filed Jan. 13, 2020].)

were "firm and final." (*Id.*)  However, on March 20, 2020, the Court granted a request to extend the deadlines as follows due to the COVID-19 pandemic: (a) expert depositions to be completed by July 3, 2020; (b) all discovery to be completed by July 3, 2020; and (c) dispositive motions to be filed by August 17, 2020.  (Dkt. No. 51 [Text Order filed Mar. 20, 2020].)  The Court further extended these deadlines *sua sponte* to September 18, 2020, for the completion of expert depositions, September 18, 2020, for the completion of all discovery, and November 2, 2020, for the filing of dispositive motions.  (Dkt. No. 56 [Text Order filed Aug. 11, 2020].)

The deposition of Dr. Tibbles was conducted on July 13, 2020.  (Dkt. No. 60, Attach. 6 [Tibbles Dep.].)  Plaintiffs' counsel's affirmation indicates that his office sent a copy of the deposition transcript and the supplemental expert report to Dr. Tibbles for her signature on both on October 13, 2020.  (Dkt. No. 60, at ¶¶ 15-16 [Santola Aff.].)  However, he had not received either back from Dr. Tibbles as of November 4, 2020.  (Dkt. No. 60, at ¶ 17 [Santola Aff.].)  On that date, his office sent another copy of the supplemental expert report to Dr. Tibbles for signature, and it eventually received the signed supplemental expert report and deposition signature page on November 13, 2020, which it "immediately" sent to Defendants.  (Dkt. No. 60, at ¶¶ 17 [Santola Aff.].)

Thus, based on the admissible record evidence, including Plaintiffs' counsel's own admissions, Plaintiffs' attempt to supplement Dr. Tibbles' expert report was untimely.  Plaintiffs first argue that (a) because pretrial disclosures are not yet due under Fed. R. Civ. P. 26(a)(3), their supplementation was timely, and (b) even if the Court finds the formal supplementation was untimely, the supplemental opinions should be deemed to have been disclosed because Defendant Koenig was aware of them based on his presence at Dr. Tibbles' deposition.

As to Plaintiffs' argument that their supplemental disclosure is timely because pretrial disclosures are not yet due under Fed. R. Civ. P. 26(a)(3), Plaintiffs ignore the Court's scheduling order related to expert disclosures and discovery.  Specifically, Fed. R. Civ. P. 26(a)(3) states that pretrial disclosures must be made at least 30 days before trial, "[u]nless the court orders otherwise."  Fed. R. Civ. P. 26(a)(3).  Rule 26.3 of this Court's Local Rules requires that the parties make disclosures of expert witnesses, including expert reports, "before the completion of discovery in accordance with the deadlines contained in the Uniform Pretrial Scheduling Order or any other Court order."  N.D.N.Y. L.R. 26.3.  As discussed above, the Court set specific deadlines for disclosure of expert reports, expert depositions, and all discovery, the latest of which expired on September 18, 2020.  Thus, the Court's scheduling order required Plaintiffs to provide any supplement to Dr. Tibbles' expert report by that date. *See Engler v. MTD Prods., Inc.*, 304 F.R.D. 349, 356 (N.D.N.Y. 2015) (Hummel, M.J.) (finding that expert supplemental disclosure was untimely where it was submitted four months after the discovery deadline that was agreed to by the parties and imposed by the Court).  Because it is undisputed that the signed supplemental report was not provided to Defendants until November 13, 2020, the supplemental report was not timely disclosed.

Nor is the Court convinced that Dr. Tibbles' deposition testimony constituted a disclosure in and of itself simply because Defendant Koenig and his counsel were present at the deposition.  Specifically, even if Defendant Koenig was aware that Dr. Tibbles testified at her deposition that she believed that Defendant Koenig's action of signing off on "substandard care" by Defendant Suslik was itself substandard care, her supplemental report contains additional opinions beyond what was disclosed even at the deposition, namely her opinion that his performance was substandard for failing "to take prompt action in personally contacting the

patient or his parents or directing others to contact the patient or his family and advise them Bryan needed to be urgently examined at an emergency department or by his family physician." (Dkt. No. 60, Attach. 11, at 2 [Tibbles Suppl. Report].)   Rather, she merely testified that there were "subsequent opportunities" in which he could have remedied the care, but she did not state anything about these specific ways in which she now opines he could have remedied that care. (Dkt. No. 58, Attach. 18, at 8-9 [Tibbles Dep.].)   As a result, the Court cannot reasonably find that Defendant Koenig was aware of the full content of the supplemental expert report by virtue of attending the deposition, and Plaintiffs therefore had a requirement to make a timely supplementation.

Additionally, the Court is not convinced that Dr. Tibbles' supplemental expert report is, in fact, a supplement as opposed to a new opinion.  *See Engler*, 304 F.R.D. at 356 (noting that "an expert report that discloses new opinions is in no way a mere supplement to a prior report"); *Coene v. 3M Co.*, 303 F.R.D. 32, 42 (W.D.N.Y. 2014) (noting that "[t]o interpret Rule 26[e]'s supplementation provisions more broadly, particularly by permitting supplementation whenever a party seeks to bolster its expert, would wreak havoc on docket control and amount to unlimited expert opinion preparation") (internal quotation marks and citations omitted); *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 06-CV-1352, 2009 WL 5873112, at *3 (D. Conn. Feb. 23, 2009) ("Plaintiff's duty to supplement its initial expert report does not arise when plaintiff seeks to bolster its earlier submission, but rather, arises 'only if the expert *subsequently* learns of information that was previously unknown or unavailable, that renders the information previously provided in an initial report inaccurate or misleading because it was incomplete.'").  Dr. Tibbles makes clear in her deposition testimony that she did not render any opinions about Defendant Koenig's involvement in her initial expert report because she was asked to provide an opinion

about the standard of care provided at Skaneateles Urgent Care on February 18, 2017, and was

never asked to comment on Defendant Koenig's liability or standard of care in the report.  (Dkt.

No. 60, Attach. 6, at 40-41, 143-44, 150-52 [Tibbles Dep.].)  If, as she readily admits, the scope

of her opinion was primarily limited to the care provided by Defendant Suslik as the individual

physically examining and diagnosing Plaintiff Bryan Casler-Tyrrell on February 18, 2017, it is

difficult to see how the addition of opinions about whether Defendant Koenig's review of the

medical chart days later violated the standard of care was because her initial expert report was

"incomplete or incorrect."  (Dkt. No. 60, Attach. 6, at 39 [Tibbles Dep.] [stating that her initial

expert report primarily related to Defendant Suslik's in-person assessment and the choices made

and care provided during the treatment visit on February 18, 2017], 1501-52 [stating that her

deposition was the first time she had been asked to opine on whether Defendant Koenig's

signing of the chart was below the standard of care]); *see Gyllenhammer v. American Nat'l Red*

*Cross*, 15-CV-1143, 2018 WL 1956426, at *4-5 (N.D.N.Y. Jan. 23, 2018) (Sannes, J.) (finding

that the expert's "supplemental" report contained new opinions and was actually a rebuttal report

that attempted to bolster the original report rather than correct the original report or disclose

newly discovered evidence); *Coene*, 303 F.R.D. at 43 (finding that the expert's second report

was a new opinion rather than a supplemental opinion because it was not based on previously

unknown information, but rather merely a "follow up" in light of questioning by defendant about

current studies that were available at the time of her initial report, and it presented potential new

causes for the plaintiff's injuries that were not posited in the original report).  The Court

therefore finds that Dr. Tibbles' subsequent expert report related to Defendant Koenig's liability

was not properly or timely disclosed on this alternative basis.

Plaintiffs argue that, despite the untimeliness, the Court should allow Dr. Tibbles'

testimony and opinions regarding Defendant Koenig to be admitted for the purposes of both

summary judgment and trial because (a) the delays and hardships imposed by the COVID-19

pandemic constitute a substantial justification for the untimely supplementation, and (b)

Defendant Koenig would not be prejudiced by its admission because he was fully aware of the

supplemental opinion due to Dr. Tibbles' deposition testimony and he had the ability to question

her about that supplemental opinion at that deposition.  (Dkt. No. 60, at ¶¶ 6-9 [Santola Aff.].)

The Court rejects both of these arguments.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to

provide information or identify a witness as required by Rule 26[a] or [e], the party is not

allowed to use that information or witness to supply evidence on a motion, at a hearing or at a

trial, unless the failure was substantially justified or is harmless.").

As to whether substantial justification for the untimeliness exists, the Court agrees with

Defendant Koenig that Plaintiffs' arguments are not wholly reflective of the full landscape of the

facts.  Despite the fact that the Court set the extended deadline for all discovery as September 18,

2020, Plaintiffs admit they did not even attempt to have Dr. Tibbles sign the supplemental expert

report until October 13, 2020, nearly a month after that deadline had passed.  Plaintiffs appear to

argue that the delay was due to not receiving the original or a hard copy of Dr. Tibbles'

deposition transcript; however, Plaintiffs do not indicate whether they had made any previous

attempt to contact Dr. Tibbles or whoever was in possession of the transcript in August or

September, nor do they assert that they informed Defendants that they were having difficulty

obtaining that transcript until October 7, 2020, after the discovery deadline had already passed.

(Dkt. No. 60, at ¶¶12-14 [Santola Aff.].)  Because there is no admissible record evidence that

Plaintiffs made any attempt to obtain Dr. Tibbles' signed deposition transcript or supplemental

expert report at any time before the Court-imposed discovery deadline had passed, the Court disagrees that the effects of the COVID-19 pandemic on Dr. Tibbles' schedule is, by itself, a substantial justification for not providing Dr. Tibbles' supplemental expert report to Defendants until November 13, 2020.  Additionally, given that the Court had already extended the discovery deadlines twice because of the impact of the COVID-19 pandemic, Plaintiffs' asserted justification was already accounted for by the scheduling order that provided the parties an additional six months to conduct discovery.  Given the clear deadline and Plaintiffs' apparent failure to actively pursue documents from its own expert (or to request a further extension from this Court), there is no basis for finding that there was any question that Plaintiffs were required to submit the supplemental expert report by the discovery deadline.  *See Engler*, 304 F.R.D. at 355 ("Substantial justification means justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.").

Additionally, contrary to Plaintiffs' argument, allowing Plaintiffs to present Dr. Tibbles' supplemental opinions about Defendant Koenig's liability would be prejudicial to Defendant Koenig.  As Defendant Koenig argues, Dr. Tibbles' supplemental opinion is the only opinion that is directly related to the issue of Defendant Koenig's liability, and thus it would obviously be to his detriment to have it admitted.  Although Plaintiffs argue that Defendant Koenig had a full opportunity to question Dr. Tibbles at the deposition, this argument ignores two undisputed facts.  First, at the time of that deposition testimony, Dr. Tibbles had not read the transcripts for depositions of Defendant Koenig or any other relevant individual, and thus it is not clear how that impacted the questions Defendant Koenig asked her (or the answers she provided), notwithstanding any indication that Dr. Tibbles later stated to Plaintiffs that none of those

depositions changed her opinions or testimony.  (Dkt. No. 62, Attach. 2, at 1.)  Second, as discussed above, Dr. Tibbles' supplemental expert report contains specifications about the ways in which Defendant Koenig should have acted to meet the standard of care that were not presented in her deposition testimony.  Given that these specifications were not raised at the deposition, there was no way Defendant Koenig could have challenged them or questioned Dr. Tibbles about that portion of her supplemental opinion.  Plaintiffs' failure to properly disclose the full and specific extent of what constitutes Dr. Tibbles' expert testimony that Plaintiffs wish to present at trial therefore prevented Defendant Koenig from having a full and fair opportunity to develop the evidence related to that testimony, including the basis of Dr. Tibbles' opinion.

Because Plaintiffs have not shown a substantial justification and because the admission of Dr. Tibbles' supplemental expert report (and the opinions expressed therein that are beyond the scope of her original expert report) would unfairly prejudice Defendant Koenig, the Court finds that sanctions are appropriate.  In determining whether preclusion of the relevant testimony is warranted, the Court has considered four factors: "(1) the explanation for failure to comply with a discovery order, (2) the importance of the new evidence, (3) the prejudice suffered by the opposing party as a result of having to meet the new evidence, and (4) the possibility of a continuance." *In re Omeprazole Patent Litig.*, 2002 WL 287785, at *5 (S.D.N.Y. Feb. 27, 2002) (citing *Softel Inc. v. Dragon Medical & Scientific Comm., Inc.*, 118 F.3d 955, 962 [2d Cir. 1997]).

As already discussed, Plaintiffs' explanation for failing to provide the supplemental expert report before the deadlines was insufficient due to Plaintiffs' failure to explain why they did not seek to get the signed report from Dr. Tibbles before the discovery deadline.  Although the Court recognizes that this evidence is certainly important to Plaintiffs' claims against

Defendant Koenig, that factor does not outweigh the prejudice to Defendant Koenig if that evidence is admitted now.  Indeed, for the Court to consider this evidence as part of its summary judgment analysis would in effect foreclose Defendant Koenig an opportunity to defend against that opinion in a meaningful way, given that the supplemental report was not provided to him until after he filed his motion for summary judgment.  However, to delay decision on the pending motions for summary judgment in order to allow admission of Dr. Tibbles' supplemental report would require further extensions of the discovery deadlines, additional briefing by both parties, and further delay in the ultimate resolution of this litigation (which has been pending since July 31, 2018).  Although there is no conclusive evidence of bad faith on the part of Plaintiffs in their untimely provision of the supplemental report, there is also not a sufficient explanation that would justify further delaying these proceedings.  The Court therefore finds that preclusion of Dr. Tibbles' opinions related to Defendant Koenig (or any other matter not disclosed in her initial expert report) as expressed in her supplemental expert report is warranted.

### C.   Whether Defendant Koenig Is Entitled to Summary Judgment on the Claims Against Him

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant Koenig's memoranda of law.  *See, supra*, Part I.C.1 and 3.  To those reasons, the Court adds the following analysis.

Defendant Koenig argues that he is entitled to summary judgment because (1) he has established both that he did not deviate from the governing standard of care and that he was not the proximate cause of Plaintiffs' injuries, and (2) without Dr. Tibbles' supplemental opinions, Plaintiffs has not provided expert proof with which to raise a triable issue of fact as to Defendant

Koenig's liability.  (Dkt. No. 58, Attach. 22, at 8-15 [Def. Koenig Mem. of Law]; Dkt. No. 62, at

13-17 [Def. Koenig's Reply Mem. of Law].)

"Under New York law, the 'essential elements of medical malpractice are (1) a deviation

or departure from accepted medical practice, and (2) evidence that such departure was a

proximate cause of injury.'"  *Doane v. United States*, 369 F. Supp. 3d 422, 446 (N.D.N.Y. 2019)

(Hurd, J.) (quoting *DiMitri v. Monsouri*, 302 A.D.2d 420, 421 [N.Y. App. Div. 1st Dep't 2003]).

When moving for summary judgment, the defendant must "make a prima facie showing that [he]

'did not depart from good and accepted medical practices or that departure did not proximately

cause plaintiff's injuries.'"  *Doane*, 369 F. Supp. 3d at 446 (quoting *Ducasse v. N.Y.C. Health &*

*Hosps. Corp.*, 148 A.D.3d 434, 435 [N.Y. App. Div. 1st Dep't 2017]).

In support of his motion, Defendant Koenig submitted a declaration from expert witness

Stephen Schultz, M.D., in which Dr. Schultz opined the following: (a) Defendant Koenig

complied with the standard of care by reviewing Plaintiff Bryan Casler-Tyrrell's medical chart

for completeness and to make sure all labs were followed up with; (b) the review procedure

followed by Defendant Koenig for his chart reviews is also consistent with the standard of care;

(c) there was no information in the medical chart that would make it a breach of the standard of

care for Defendant Koenig to have failed to diagnose meningitis; (d) Defendant Koenig was not

required to order additional testing under the circumstances because he did not personally treat

Plaintiff Bryan Casler-Tyrrell; (e) the standard of care did not require Defendant Koenig to

provide additional follow-up or treatment because Defendant Suslik had already advised

Plaintiffs to follow up with his primary care doctor or go to the emergency room if symptoms

worsened; and (f) Defendant Koenig was not a cause of Plaintiffs' injuries because he did not

treat Plaintiff Bryan Casler-Tyrrell, Plaintiff Bryan Casler-Tyrrell did not exhibit symptoms of

meningitis until days after Defendant Koenig reviewed his chart, and Defendant Koenig would not have provided any different follow-up instructions to Plaintiffs than the ones that were indeed provided to Plaintiffs by Defendant Suslik.  (Dkt. No. 58, Attach. 15.)

In response, Plaintiffs argue that Dr. Schultz's opinion about Defendant Koenig's review process and role (i.e., that he reviewed charts merely for completeness and billing purposes) is inconsistent with Defendant Koenig's own deposition testimony and other evidence.  (Dkt. No. 60, Attach. 19, at 8-9 [Pls.' Opp'n Mem. of Law].)  However, Plaintiffs' disagreement with Dr. Schultz's interpretation of the evidence he reviewed is a credibility issue.  Plaintiffs have not argued that Dr. Schultz's opinions lack foundation, merely that they disagree with his conclusion based on their own interpretation of the evidence.  Nor is the Court convinced that Dr. Schultz's interpretation of the evidence is so removed from the evidence he considered as to be lacking a proper or reliable foundation such that there would be concerns about its admissibility.  *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 76 (S.D.N.Y. 2015) (noting that, although "[d]istrict courts are charged with acting as gatekeepers to exclude invalid and unreliable expert testimony and are given broad discretion to make such determination," they should consider only "the admissibility of expert evidence rather than its weight or credibility," because "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence") (internal quotation marks and alterations omitted).  If Plaintiffs believe Dr. Schultz's opinion is incorrect, the proper way to challenge it is through presentation of contrary expert testimony or other evidence, and cross-examination.  As a result, the Court has no basis for finding that Dr. Schultz's opinion is insufficient at this stage to meet Defendant Koenig's burden to make a prima facie showing that he is not liable for Plaintiffs' injuries.

Generally, "summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." *Doane*, 369 F. Supp. 3d at 446 (quoting *DiGeronimo v. Fuchs*, 101 A.D.3d 933, 936 [N.Y. App. Div. 2d Dep't 2012]).  However, to rebut a defendant's prima facie showing, the plaintiff "'must submit evidentiary facts or materials,' typically through expert testimony, and 'demonstrate the existence of a triable issue of fact.'" *Doane*, 369 F. Supp. 3d at 447 (quoting *Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 324 [N.Y. 1986]); *see Junger v. Singh*, 393 F. Supp. 3d 313, 321 (W.D.N.Y. 2019) ("To survive summary judgment, a medical malpractice plaintiff 'must present expert testimony' and 'the expert's opinion must demonstrate the requisite nexus between the malpractice allegedly committed and the harm suffered.'") (quoting *Ongley v. St. Lukes Roosevelt Hosp. Ctr.*, 725 F. App'x 44, 46 [2d Cir. 2018]).

As discussed above in Part III.B. of this Decision and Order, Dr. Tibbles' opinions contained within the supplemental expert report (which relate to Defendant Koenig in particular) will not be admitted due to Plaintiffs' failure to make a timely disclosure of those opinions. Given that this supplemental opinion was the only expert opinion offered regarding Defendant Koenig's culpability in Plaintiff Bryan Casler-Tyrrell's injuries and that the questions involved in the claims against Defendant Koenig (i.e., whether he deviated from the standard of care in his assessment of Plaintiff Bryan Casler-Tyrrell's treatment or otherwise failed to order additional treatment or recognize that a serious infection was present) are out of the competence of a lay jury to decide without expert testimony, Plaintiffs have failed to offer necessary expert testimony rebutting Defendant Koenig's prima facie showing.  *See I.M. v. United States*, 362 F. Supp. 3d 161, 190-91 (S.D.N.Y. 2019) ("It is well established in New York law that unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the

plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice.") (*Sitts v. United States*, 811 F.2d 736, 741 [2d Cir. 1987]); *Foley v. United States*, 294 F. Supp. 3d 83, 96 (W.D.N.Y. 2018) (recognizing that "the medical malpractice case in which no expert testimony is required is rare").

As a result, Plaintiffs have not created a genuine dispute of material fact, and Defendant Koenig's motion for summary judgment on the claims against him must therefore be granted.

**ACCORDINGLY**, it is

**ORDERED** that Defendant Auburn C.H.'s motion for partial summary judgment (Dkt. No. 57) is **GRANTED**; and it is further

**ORDERED** that Defendant Koenig's motion for summary judgment (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' cross-motion to admit the untimely supplemental expert report from Dr. Tibbles (Dkt. No. 60) is **DENIED**; and it is further

**ORDERED** that Plaintiffs' cross-motion for summary judgment against Defendant Auburn C.H. (Dkt. No. 59) is **DENIED**; and it is further

**ORDERED** that any claims for direct liability against Defendant Auburn C.H. are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiffs' claims against Defendant Koenig are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff is directed to forward a written settlement demand to defendants no later than **September 24, 2021,** and the parties are directed to thereafter engage in meaningful settlement negotiations. The parties are directed to jointly file, on or **October 22,**

**2021**, regarding their settlement discussions and if a settlement conference would be beneficial

or a jury trial date should be scheduled.


Dated: September 17, 2021
      Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge